**FILED**

1    ROBERT EUGENE ROJAS #6207556

2    651 "I" ST.

     JUN 24 2022

3    SACRAMENTO, CA. 95814

     CLERK U.S. DISTRICT COURT

4    ATTORNEY FOR THE PLAINTIFF

     EASTERN DISTRICT OF CALIFORNIA

     BY _____

5    IN PRO-PER

     DEPUTY CLERK

6

7                   UNITED STATES DISTRICT COURT

8            FOR THE EASTERN DISTRICT OF CALIFORNIA

9                                    **EPG (PC)**

10    ROBERT EUGENE ROJAS        CASE. No 1:22-CV-776

11        PLAINTIFF.           COMPLAINT FOR INJUCTIVE AND DECLARATORY

12    V.                       RELIEF AND MONETARY VALUE AND

13    COUNTY OF SACRAMENTO       PUNITIVE DAMAGES

14        DEFENDANT.

15

16                       NATURE OF THE ACTION

17

18      1. This action arises out of Defendant's unconstitutional and illegal treatment of

19    Plaintiff Robert Eugene Rojas who is incarcerated in the Sacramento County Main Jail

20    ("Main Jail"). Defendant knowingly has created and perpetuated overcrowded and an under-

21    staffed jail, subjecting Plaintiff to dangerous, inhumane and degrading conditions.

22      2.1 Defendant regularly subjects Plaintiff in it's custody — whom has not been convicted

23    of any crime — to harsh, prolonged, and undue isolation. Defendant has locked up Plaintiff in

24    solitary confinement in a dark, cramped, filthy cell for 23½ hours or more per day. While

25    Plaintiff is held in isolation, Defendant deprives him of human contact, programming, fresh air,

26    and sunlight. Plaintiff does not get outside to see the sun for weeks or months at a time.

27    The extreme isolation and deprivation place Plaintiff at risk of profound physical and psychologi-

28    cal harm.

3.   Defendant incarcerated Plaintiff with serious mental illness, which has been Defendant's consistent practice of incarcerating people with serious mental illness, at dangerous and disproportionately high rates. Defendant subjects Plaintiff with serious mental illness to extreme isolation, with little or no mental health treatment. Defendant fails to provide adequate mental health care, including basic measures to prevent suicide and self harm. Defendant's failure to provide minimally adequate mental health treatment — combined with deplorable conditions of confinement in the jails — exacerbates Plaintiffs' existing mental illnesses, and increases the likelihood that Plaintiff will decompensate again or death.

4.   Since November 2016, at least five individuals have died by suicide while held in Sacramento County Jails. Plaintiff and many more individuals have attempted suicide, resulting in grave injuries as serious as permanent scarring or permanent paralysis.

5.   Defendant fails to provide minimally adequate medical care to Plaintiff in it's custody. Defendant failed to adequately screen Plaintiff entering the jail for medical conditions, does not timely or adequately respond to requests for medical care, and denies or delays for excessive periods the provision of necessary chronic and specialty care. Defendant examines and treats patient in common spaces of the jail, without basic confidentiality, rather than in proper exam rooms with necessary medical equipment. Defendant's failure to provide adequate medical care subjects Plaintiff to serious risk of injury or death. Plaintiff held in the county jail has been denied essential covid treatment, diminished his eyesight where treatment could have prevented it, and faced needless pain and irreparable harms due to delayed or denied care.

6.   Defendant deprives Plaintiff with disabilities access to jail programs, activities and services. Defendant fails to adequately screen plaintiff with disabilities or provide him necessary accomodations, including lower tier/lower bunk chrono, transitional eyeglasses, chrono not to force Plaintiff to wake up at very early times for count time, hearing aids, payphones with a full reciever with chairs to sit on, ethnic hiegenic products, and other items he needs to perform everyday activities. Defendant's jails are full of physical obstacles

1   That prevent plaintiff with mobility disabilities from bathing, moving around the housing

2   unit, speaking on the payphone, or visiting with attorney's.   Plaintiff held in the jail

3   has been deprived access to Jewish Religious services.  Defendant does not allow plaintiff

4   to speak to a Rabbi, practice Judaism, or receive a Jewish Kosher diet, and Judaism

5   Religious reading material.  Defendant does not provide hair picks, adequate hairbrushes,

6   adequate shampoo or conditioner, and haircease to plaintiff whom is of Puerto Rican,

7   Dominican, and Italian descent, with long, thick, curly hair, leaving him to instead

8   suffer dry, damaged, knotted tangled hair, dry, itchy scalp, and hairless.  Defendant

9   does not provide an adequate full library, library book catalog or books, Diploma or

10  GED courses, vocational training, and Pre-Release planning at the main jail.

11  Defendant's payphones are placed to high on the wall, have no receivers, only small holes

12  have very low volume, and do not properly dial out because of the phone service voice

13  Recognition consistent malfunctions, and do not properly hang up.

14      7.   Defendant deprives plaintiff with disabilities access to adequate legal services

15  and law library.   Plaintiff has been Pro-per in a unrelated criminal matter since April 2021,

16  even held in the main jail Defendant has failed to accomodate access to designated Pro-per phones,

17  located in a confidential setting away from inmates, jail personnel, and officers, that is not

18  monitered or recorded, access to funds to make legal Pro-per phone calls, access to timely

19  legal Research Requests, adequate legal Research, access to adequate and timely legal mail

20  process, use of a type writer for legal document's, access to a tablet or other electronic

21  device to Review audio and visual discovery, adequate writing implements, and confidentiality

22  of legal mail, and legal material possessed by Plaintiff in his cell.   Defendant's payphones

23  are all located in the middle of the main jail housing units in earshot of inmates, jail

24  personnel, and officer's, They are all monitered, recorded, and must be collect calls payed

25  for by Plaintiff who is indigent or the Reciever.  Defendant's law library kiosk's uses only

26  one particular legal software that is inadequate even under the California Code of

27  Regulations Title 15.  Defendant takes up to a week or more to respond to Requests for

28  legal Research, the legal Research is either vague, overbroad or not what Plaintiff Requested,

1  creating more unnecessary delays. Defendant does not log outgoing legal mail, provide

2  a recorded copy of outgoing legal mail, and uses a practice of reading legal mail, and

3  speculating what Defendant personally believes is or is not considered to be legal

4  mail, and opening or tampering with the seal of sealed legal mail out of Plaintiff's

5  presence. Defendant fraudulently marks legal mail ("envelopes") with fraudulent

6  post markings making Plaintiff's legal mail look as if it was sent and post marked by the

7  U.S postal service when it never had been sent or postmarked by them, delayed and

8  withheld. Defendant's county jail has no type writer or carbon paper for Plaintiff

9  and provides extremely dull, fragile pencils with light lead that does not appear on copy

10  paper, have to press down to hard to write straining hands and causing joint pain, and

11  break easily. Defendant fails to provide pencil sharpeners subjecting Plaintiff to have

12  to gnaw at the pencil wood and sharpen the lead on the bunk resulting in his teeth

13  chipping.

14      8.   Defendant's solitary confinement unit is overcrowded, filthy, unsanitary and

15  bug, insect, and rodent infested. Defendant fails to adequately clean, sanitize and reduce

16  overcrowding. Plaintiff shares a small housing pod with 50 other inmates. Many are

17  mentally ill and flood contaminated urine and fecal toilet water onto the tier, well others

18  smear fecal matter or splash urine out of cups throughout the entire pod. Throughout the

19  day, and night jail personnel, officers, and inmates track the fecal matter and urine around

20  the pod, and cells. Trash, particles of old, spoiled food, spilled drinks, debris, lint and

21  dust litter the ground, and stairs accumulating in the small overcrowded pod throughout

22  the day, and night. The trash can in the pod has no bag to hold trash resulting in a horrible

23  odor that does not go away. Defendant does not clean the pod throughout the day only once

24  at 2:00 am. every morning, and only the floor area behind the red line is swept and mopped.

25  The rest of the floor, and stairs is not. The trash can is not cleaned out, the railing, tables,

26  seats, phones, windows, doors, showers, and walls are never cleaned. Defendant does not

27  contract a hazman to sanitize the pod. The overcrowded, filthy, unsanitary, bug, insect,

28  and rodent infested pod place Plaintiff at serious risk of profound health issues, and

1  Medical complications.  In October 2021 the pod was placed on quaranteen due to a

2  COVID-19 outbreak, and one individual has been infected by staphe infection.

3       9.    Defendant fails to provide adequate bedding, linen, mattresses and clothing.

4  To Plaintiff in it's custody.  The Mattresses are extremely flat, never sanitized or cleaned

5  prior to Defendant subjecting Plaintiff to it's use. They are contaminated with bodily

6  fluids, bacteria and fungi.  One individual repeatedly defacated or urinated ("wet")

7  the bed well other individuals sweat or masturbate on them and drag them on the filthy

8  floor. Defendant fails to provide sheets or pillow resulting in sticking to the plastic

9  Mattress, and severe neck pain.  Defendant does not provide Plaintiff more than one

10  pair of pants, one pair of socks, one pair of underware, one T-shirt and one over T-shirt

11  once a week, subject Plaintiff to wearing filthy, sweaty clothing for prolong periods of

12  time that smell. Placing him at Risk of serious medical complications and health issues.

13     10.   Defendant delays, with holds and Returns plaintiffs mail after with-holding

14  it for up to 2~3 months. The envelopes are not sent to the U.S postal Service office

15  to be post marked and stamped. Defendant fraudulently places their own fraudulent

16  post marks and stickers on Plaintiff's envelopes to justify Returning them to

17  Sender. Plaintiff has loss over $22.00 in photographs purchased and over

18  $22.00 in postage stamps sending out mail through the jail. He is not able to

19  recieve or send out any non legal mail, or recieve emails.

20       11.   Defendant has a inadequate disciplinary process that Restricts

21  The Plaintiff from The exercize of due process of law.  Defendant prohibits

22  Plaintiff adequate time to prepare and present a adequate defense, call or

23  question witnesses, present evidence or review audio or visual evidence.

24  Defendant does not provide Plaintiff the assistance of a investigative

25  employee to gather evidence and interview witnesses, well his Restrictive

26  housing prevents him to. Defendant does not provide Plaintiff the

27  assistance of a Staff assistant to assist in the preparation and presen-

28  tation of a defense and explain the disciplinary process, Rights and

1  administrative Remedies well Plaintiff is mentally ill and needs the
2  assistance. Defendant does not provide any mental health assessments
3  in Relation to the disciplinary process on wether a there is a nexus
4  between the alleged behavior and mental disorder or Recommendation by
5  a mental health clinician Regarding imposing Restrictions due to
6  mental Stability. Defendant imposes a consecutive sentence instrument
7  for individual allegations within a single discipline arising out of the
8  same event which Results in the imposition of excessive disciplinary methods
9  for prolong periods that can Range anywhere between 30~45 days. Restrictions
10  include: (1) loss of phone; (2) loss of Tablets and out~of cell activities; (3)
11  removal from general population and Ad·Seg 2." groups and placement in
12  disciplinary Segregation; (4) extreme isolation and deprivement of
13  interaction with peers; (5) scheduling Plaintiff last for dayRoom at
14  very odd hours that are either very late (eg. 1800 pm. or later) or very
15  early (7:00 am. or earlier) well Plaintiffs peers are asleep and
16  before or after business hours when legal contacts are not available
17  to contact by telephone; (6) a minimum of 30~minutes or less of
18  dayRoom, or sometimes no dayRoom at all. Defendant subjects
19  Plaintiff to excessive, prolong periods of disciplinary restrictions
20  and disciplinary segregation that is consecutive to the previous term
21  that can Range anywhere between 30~45 days if Plaintiff is found
22  guilty of another Rule violation well serving the previous Term.
23  Defendant gives little to no Regard to the harmfull affects to
24  Plaintiffs mental Stability, which Defendant is aware has Resulted
25  in decompensation on numerous occasions. Defendant has failed
26  to provide an adequate mental health assessment prior to locking
27  up Plaintiff in disciplinary segregation. Defendant has acted bias
28  prejudice, or impartial in imposing disciplinary Restrictions

1  often imposing them with a predetermination of guilt. Defendant

2  does not provide a final copy of the disciplinary hearing Results

3  or disposition and provides no timely administrative remedy to challenge

4  the disciplinary disposition and final Results. Defendant has

5  retaliated and harassed Plaintiff for submitting institutional

6  grievances attempting to challenge disciplinary Restrictions to

7  discourage Plaintiff from exercize of his Right of Redress of

8  grievances.

9      12.  Defendant has imposed excessive consumer fees for depositing

10  funds into Plaintiff's inmate TRUST account well in it's custody and

11  imposing disproportionate, extremely high prices and sales taxes for

12  commissary store items that are of very poor quality, generic, and

13  very small weight amounts. Most commissary products are never the

14  same as products Defendant allows to be advertised to Plaintiff.

15  Plaintiff is not aware of this discrepency until Recieving his order.

16  at that time his order will not be reimbursed if he opens the bag to

17  examine his order for discrepencies. If the bag is opened for a discrepency

18  for missing or inaccurate item the Plaintiff is directed to accept the

19  whole order with the discrepency or forfeit the entire order. Defendant

20  provides only one commissary vendor and TARGETS Plaintiff as well as

21  other inmates with extremely high prices knowing Plaintiff and

22  other inmates are in it's custody and have no other vendor to order

23  commissary from. Plaintiff and other inmates are TARGETED by

24  Defendant imposing extremely high excessive prices and treated

25  differently from similar situated inmates in detained in other penal

26  institutions whom are charged extremely cheaper prices for the

27  same, similar, or better quality product with larger weight sizes.

28  Defendant has the ability to modify the price and product types to sell

1  and advertise to defendant and has chosen not to. Defendant has
2  misused the profits gained from Plaintiff and other inmates
3  commissary purchases, purchase and TRUST ACCOUNT fee's for lavish
4  vacations, exotic travel destinations and expenses, employee
5  salaries and bonuses, jail maintenance expenses, expenses to house
6  inmates, and jail operational expenses. Well the whereabouts
7  of tax payer dollars required for these operational expenses are
8  unknown.   Defendant gives no regard to the serious financial
9  burdens or hardships it subjects Plaintiff or other inmates and their
10 families to who are already poor, unemployed and near the verge
11 of homelessness. Defendant's inaction and action have resulted in
12 deliberate indifference and caused Plaintiff and other inmates
13 to not be able to post bail, became indigent as well as various other
14 financial hardships that have occured well also suffering through
15 the COVID-19 epidemic recession.
16     13.   The Defendant operates an inadequate grievance process,
17 and subjects Plaintiff to retaliation, hazing and harassment.
18 Defendant has no accessable grievance forms within housing unit
19 pods or a grievance drop box Plaintiff can access in his housing
20 pod.  Plaintiff is required to verbally request a grievance from
21 Defendant who is named in the grievance. Defendant will often
22 deny grievance forms or if provided will read and respond to the
23 grievance Plaintiff submits against them regularly resulting in the
24 grievance being denied or never being resolved. To discourage
25 Plaintiff from exercizing the right to redress of grievances it will
26 retaliate against him. If the Plaintiff mails grievances concerning
27 retaliation and harassment, Defendant will intentionally redirect
28 grievances to Defendant named in the Plaintiffs grievance. The grievance

1  is withheld by Defendant to pass around to jail personnel and
2  officers throughout the jail and on different shifts. Resulting in
3  the complaint process becoming compromised, issues never
4  being resolved by defendant, and Plaintiff being harassed, hazed and
5  retaliated against by jail personnel and officers.
6      14. Defendant has been aware of the constitutionally and legally inadequate
7  care and conditions in it's jails for years. Reports from multiple outside agencies
8  and consultants have repeatedly documented chronic overcrowding and and
9  understanding in the jails, major deficiencies in health care, excessive use of
10  isolation, and the denial of rights with people with disabilities.
11      15. In the last decade, no fewer than a dozen Reports have detailed
12  significant deficiencies in the treatment of individuals in the Sacramento
13  County jails and, in particular, the treatment of individuals with
14  disabilities. Inspector General Reports, Grand Jury Reports, and reports completed by subject
15  matter experts retained by the county have repeatedly made clear that the health and
16  wellbeing of people incarcerated in the jails are at Risk. They have found that conditions are
17  "unlikely to meet constitutional standards" and identified "serious violations" of the
18  Rights of people with disabilities.
19      16. In 2015, after a detailed investigation, Disability Rights California issued a
20  Report (See Exhibit A) on Conditions in Sacramento County jails. The report documented
21  harmful policies, practices, and conditions that adversely impact prisoners, in
22  particular prisoners with serious mental illness, medical conditions, and physical,
23  sensory, or mental health disabilities. The report detailed the jail's inadequate health
24  care system, excessive use of solitary confinement, and violations of federal disability
25  law. Nearly all the deficiencies identified in the report persist, and Recommendations to
26  address those deficiencies remain largely unimplemented.
27      17. In January 2016, the Prison Law Office entered into a structured negotiations
28  agreement as an alternative to imminent litigation against the Defendant for a class action

Page 9 of

1  concerning conditions of confinement in Defendant's jails. The parties had agreed to work

2  toward a settlement to address the conditions of confinement in Defendant's jails. The parties

3  further agreed that Defendant would retain neutral experts to advise it about health care

4  and custodial practices in the jails, and that their reports would be admissible in evidence and

5  available to the public. After two and a half years of negotiations, their settlement

6  process deteriorated.

7       18. Since early 2016, Defendant has contracted with five nationally recognized subject

8  matter experts to assess conditions in the jails and make recommendations. The experts

9  issued written findings, consistent with those of Disability Rights California, condemning

10  the conditions of confinement in the jails, identifying serious risks of psychological

11  and physical harm to people in the jails, and calling for significant and immediate changes to

12  address the deficiencies.

13      19.  Correctional expert Eldon Vail documented dangerous understaffing and inhumane,

14  excessively punitive conditions of confinement, such as the widespread use of prolonged

15  solitary confinement and the practice of withholding food from individuals for disciplinary

16  purposes.  See Exhibit B: Eldon Vail, Sacramento County Main Jail, Mentally Ill Prisoners

17  and the use of Segregation: Recommendations for Policy, Practice and Resources. The

18  Vail Report concluded that custody staffing for both jails is "startling and dangerously

19  low", and found that Defendant's jails "operate in a state of perpetual emergency"

20  on account of understaffing."

21      20.   Psychiatric expert Bruce Gage found that Defendant fails to provide minimally

22  adequate mental health care, in part due to significant understaffing of mental health

23  professionals. See Exhibit C: Bruce C. Gage, Evaluation of Mental Health Services:

24  Sacramento County Jails. Dr. Gage found that conditions for people with mental

25  illness in the jails are dangerous, noting that "those with psychotic disorders can be

26  expected to become more psychotic" and "those who are depressed, suicidal, or self-

27  destructive are similarly placed at greater risk of harming themselves" given the jails

28  conditions and lack of treatment.

21. Jail suicide prevention expert Lindsay Hayes identified numerous problems with Defendant's suicide prevention policies and practices. He reported that defendant subjects individuals on suicide watch to punitive and anti-therapeutic[20] conditions. See Exhibit D: Lindsay M. Hayes, Report on Suicide Prevention Practices within the Sacramento County Jail System. Mr. Hayes identified structural hazards in the jails' physical plant that increase the risk that individuals will die by suicide. He provided twenty-six recommendations to address deficiencies in Defendant's system. Defendant has failed to implement many, if not all, of these recommendations. Meanwhile, the suicide rate in the Defendant's jails has increased since Mr. Hayes issued his report, with at least five suicides occuring between December 2018 and April 2019 alone.

22. Correctional disability access experts Sabot Consulting, LLC found scores of serious violations[21] of the American with Disabilities Act in Defendant's jails, including inadequate screening for disabilities, denials of disability-related accommodations, improper housing of individuals with disabilities, denial of equal access to jail programming and recreation, inadequate disability-related policies and procedures, and lack of training for staff. See Exhibit E: Sabot Consulting, Sacramento County Sheriff's Department Correctional Services, Americans with Disability Act (ADA) Assessment. Few, if any, of Sabot's recommendations to address these serious violations have been implemented.

23. Correctional experts Jim Austin, Emmitt Sparkman, and Robin Allen ("Austin et al.") assessed Defendant's highly isolated and punitive " Total Separation" (or "T-Sep") classification. See Exhibit F: James Austin et al., Evaluation of the Sacramento County Jail Inmate Classification and T-Sep Systems. Austin et al. documented scores of people classified as T-Sep being " placed in harsh conditions of solitary confinement and isolated from direct contact with other inmates for excessive periods of time." They found that the T-Sep classification and it's harsh solitary confinement conditions are[22] unique to Sacramento County." They also found that over 75% of

1  of the more than 162 individuals in the jails' T-Sep units had mental health needs,

2  and many more were housed in T-Sep in part because Defendant lacks appropriate

3  and safe places to house people with mental illness.

4     24. Even as Defendant's own consultants have documented serious and widespread

5  violations of the rights of people in its custody, Defendant has failed to take

6  reasonable steps to mitigate the harms inflicted on people everyday. Widespread

7  understaffing of mental health, medical, and custody personnel persists. People

8  in the jail remain unable to access timely and appropriate health care. Hundreds

9  of people live in conditions of profound sensory deprivation due to their T-Sep

10 status and related custodial practices at the jail. Defendant has failed to make

11 physical plant renovations to expand disability access or address known suicide

12 hazards. Nearly all of the serious and dangerous deficiencies identified by the

13 County's experts remain to this day.

14    25. Plaintiff ROBERT EUGENE ROTER seeks declaratory and injunctive relief

15 monetary value, and punitive damages for Defendant's constitutional and

16 statutory violations.

17

18                              JURISDICTION

19    26. The claims alleged herein arise pursuant to 42 U.S.C. § 1983 and the

20 first and fifth Amendments, Sixth and Eighth Amendments, and the fourteenth

21 Amendment to the United States Constitution, the Americans with Disability

22 Act (ADA), 42 U.S.C. § 12101 et seq., and section 504 of the Rehabilitation Act,

23 29 U.S.C. § 794.6, and related state law.

24    27. Jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1331, 1343,

25 and 1367. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§

26 1343, 2201, and 2202; and 42 U.S.C. § 1983 and 12117(a); and California Government

27 Code § 11135.

28                                 VENUE

28.   Venue is properly in this court, pursuant to 28 U.S.C. § 1391 (b)(1), because Plaintiff's claims for relief arose in this District and one or more of the Defendants reside in this District.

PARTIES

PLAINTIFF

29.   Plaintiff ROBERT EUGENE ROJAS is a pre-trial detainee with serious mental illness, who has limited vision and serious cataracts condition from inner eye scaring, as well as chronic back pain, nerve damage, severe asthma, COPD, allergies, sensitive skin, eczema, dandruff, dry damaged hair, and suffers from metabolic deficiency from serious protein and calorie malnutrition and mass weight loss. He has been Pro-Per in his criminal proceedings since April 2021 which have been stalled and delayed since August 2021 based on the deprivement of Pro-Per supplies, legal services, and access to a designated Pro-Per phone that is not monitored or recorded, in a confidential setting. Defendant has placed Mr. Rojas in Solitary Confinement housing for his entire period of incarceration. In solitary confinement, he has suffered worsening depression, extreme grief, extreme anxiety, suicidal thoughts, attempted suicide, and engaged in self-mutilation countless times, flash backs, and nightmares precipitated traumatic events, extreme panic, fear, helplessness, hopelessness, insomnia, vitamin D deficiency from lack of exposure to sunlight, metabolic deficiency from serious protein and calorie malnutrition, and mass weight loss from being deprived a legal standard wholefull, healthy 3-course meal, dry, itchy skin, with rash, puss, and bleeding, dry, damaged hair, and scalp, extreme hair dandruff and hair loss, as a result of being deprived adequate higenic, and ethnic supplies, limited vision, and severe cataract condition that has continued to get worse due to lack of adequate treatment during his incarceration at the jail.

1  Chronic back pain, and nerve damage that has continued to get worse
2  due to lack of treatment, inadequate medical care, use of excessive force
3  and unnecessary use of restraint devices by defendant, and subjecting
4  him to go up and down the stairs, sleep or lay on paper thin mattresses
5  or on the concrete floor. He relies on a lower tier, lower bunk chrono, pain
6  medication, and neurological ointment Defendant has denied. COPD and severe
7  asthma that have caused his lungs to deteriorate; and lung disease to grow
8  worse due to lack of adequate treatment. He relies on a nebulizer breathing
9  treatment, prednizone steroid tablets, singular, zyrtec, and claritan tablets,
10  Pro-Air, and advair inhalers, and regular scheduled visits with a licensed
11  pulmonologist who specializes in COPD. Defendant has further denied Plaintiff.
12  Defendant has failed to provide Mr. Rojas adequate medical and mental health
13  care and has subjected him to discrimination based on his disability by denying
14  him reasonable accomodations and access to services and programs at the
15  jail. Defendant has failed to provide Mr. Rojas Religious services to
16  exercize his belief in Judaism and has denied him a Religious Kosher diet
17  and Jewish Reading materials, Rehabilitation programs, Pre-Release
18  planning and educational services. Defendant has further Retaliated against
19  Plaintiff Robert Eugene Rojas by delaying, with-holding, rejecting, tampering
20  destroying and disposing of his incoming and outgoing legal mail and regular
21  mail, intentionally antagonizing his mental health symptoms and excacerbating
22  Mr. Rojas mental illness, imposing excessive and extreme disciplinary methods
23  and Restrictions in disciplinary segregation in solitary confinement for
24  extended periods during which his mental health has deteriorated, on each
25  occasion Defendant denied Mr. Rojas Due Process of law throughout the
26  Rule violation review process, excessive force on multiple occasions, cell
27  searches where his cell was trashed and his property destroyed, disposed
28  of, and given away to other inmates by Defendant, theft of Mr. Rojas

1  manuscripts by Defendant, sexual harassment, threats, hazing, obscene
2  language, Mr. Rojas being denied food, human contact, and out-of-cell
3  time, and grievance forms, supplies, and Defendant disclosing Mr. Rojas
4  complaints, and confidential medical records to non-authorized persons
5  without his consent. Mr. Rojas has a history of suicidal ideations and
6  attempts. Defendant designated Mr. Rojas as "Total Separation" meaning he
7  was placed in solitary confinement with essentially no human contact and
8  almost complete isolation. Further, Defendant designated him as disciplinary
9  segregation meaning he was restricted privileges on "full restriction"
10 for prolong periods which Defendant denied him commissary, packages, access
11 to chores, program services, tablets, and designated him as "T-Sep" which
12 he would only recieve 80 minutes of dayroom early in the morning at 6:00 am.
13 or late at night at 11:00 pm. alone well all other inmates were asleep and
14 Defendant had the tv turned off. Plaintiffs attempted suicide well in
15 Total Separation solitary confinement on disciplinary segregation, and expressed
16 suicidal ideation on multiple occasions, resulting in placements in cold
17 safety cells and empty classrooms in suicide-wrap devices in view of other
18 inmates. This resulted in a persistant cycle of decompensation that
19 repeated itself consistenly on a continuous basis. Plaintiff Rojas is a
20 person with a disability as defined in 42 U.S.C. §12101, 29 U.S.C. §705(9)(B),
21 and California Government Code §12926 (i) and (m).
22 DEFENDANTS
23     38.  Defendant COUNTY OF SACRAMENTO ("County" or "Sacramento County")
24 is a public entity, duly organized and existing under the laws of the State
25 of California. Under this authority, Defendant County operates and
26 manages two jails: The Main Jail, located in downtown Sacramento, and
27 Rio Consumnes Correctional Center, located in a rural area of Elk
28 Grove. The County has at all relevent times been responsible for the

1    actions and (or) inactions and the policies, procedures, practices, and

2    customs of the Sacramento County Sheriff's Department.

3       31. Defendant is Responsible for ensuring that the basic human

4    needs of individuals in it's custody are met, and for ensuring that individuals

5    are not at Risk of serious harm, including by providing appropriate

6    funding, oversight, and corrective action to ensure adequate conditions.

7    Defendant is also Responsible for ensuring that jail policies and practices

8    do not violate individuals' substantive and procedural Rights or discriminate

9    against individuals with disabilities. Further, Defendant is Responsible

10   for ensuring that adequate legal services, legal materials and law library

11   access, legal visits, designated Pro-Per phones that are not monitored or

12   recorded in a confidential setting and a legal mail process for documenting

13   and Recording incoming or outgoing legal mail and timely delivery of

14   legal mail to Pro-Per inmates is established, implemented and monitored

15   to ensure Defendant does not interfere or violate Pro-Per inmates

16   substantive Rights. Defendant is Responsible for processing

17   incoming and outgoing Regular mail for timely delivery to individuals

18   held in it's custody and delivery to the U.S. postal Service ("U.S.P.S.")

19   Defendant is also Responsible for ensuring no postal violations are

20   committed by Defendant.

21      32. Defendant Jail Psyche Services ("JPS") is a public entity,

22   duly organized and existing under the law of the state of California.

23   Under this authority, Defendant operates and manages Psychiatric

24   Services at the main Jail under contract with the County. JPS is

25   located at the main Jail, located in downtown Sacramento, and

26   Rio Cosumnes Correctional Center, located in a Rural area of Elk

27   Grove. The JPS has at all Relevant times, been Responsible for the actions and

28   (or) inactions and the policies, procedures, practices, and customs of the Jail Psyche

1  Services.

2  33.  Defendant is responsible for ensuring that the basic human needs

3  of individuals in its care are met, and ensuring that individuals are not

4  at risk decompensation or serious harm, including by providing appropriate

5  funding, oversight, and corrective action to ensure adequate mental health

6  services are provided.  Defendant is also responsible for ensuring that jail

7  policies and practices do not violate individuals' substantive and procedural

8  rights or discriminate against individuals with disabilities.

9  FACTUAL ALLEGATIONS

10  I.  DEFENDANT KNOWINGLY OPERATES DANGEROUSLY UNDERSTAFFED JAILS

11  34.  Defendant incarcerates far more people than it is able to house safely and

12  humanely in its jails.  Together, the two jails incarcerate approximately 3,800

13  people each day, including both pretrial and sentenced individuals.

14  35.  The large jail population stems from the county's high incarceration rates,

15  particularly of people with mental illness and real disabilities.  In November 2016,

16  an outside consultant hired by Defendant, CGL Management Group, LLC ("CGL"), tied

17  the overcrowding in Defendant's jails to the county's incarceration rate, which was

18  reported to be 41% higher than the California average, and higher than most

19  California Counties.  Defendant has a higher-than-average incarceration

20  rate because of long lengths of stay in the jails, lack of community diversion

21  programs, lack of transitional and supportive housing for people experiencing

22  homelessness, an unnecessarily harsh bail system, and under-utilized pretrial

23  release system, unlawful hold system for parolees and probation, and longer-

24  than-average probation terms.  Defendant disproportionately incarcerates

25  people with serious mental illness.  Because Defendant fails to provide sufficient

26  community resources to meet the needs of people with mental illness, such as

27  community mental health services, crisis intervention, and supportive

28  housing, people with mental illness regularly cycle in and out of the jails, and

1  newly paroled individuals released from California Department of

2  Corrections and Rehabilitation ("CDCR") are incarcerated without bail

3  or Pretrial Release after serving long prison terms, contributing to

4  their unnecessary and harmful incarceration.

5      36.  In 2015, the Sacramento County Grand Jury reported that the number of

6  people who received a mental diagnosis at the time of intake at Defendant's jails

7  had nearly doubled since 2009, from 18% to 34%. Defendant has understaffed its

8  mental health program for over a decade, and the program falls further and

9  further behind as the share of individuals with mental health needs in Defendant's

10  custody remains exceedingly high.

11      AA. Defendant Subjects People in it's custody to Serious Risk of Harm

12          by failing to provide Adequate Custody and Health Care Staff.

13      37.  Defendant's jails are alarmingly understaffed. Due to Defendant's

14  failure to provide adequate Resources, the jails maintain dangerously low levels

15  of custody staff.

16      38.  As a result, Defendant is unable to comply with it's own policies and

17  procedures, as well as correctional practice standards, with respect to

18  supervision, out-of-cell time and programming, mental health and medical care,

19  and cleanliness. Defendant also maintains insufficient staff to ensure timely

20  emergency or outside hospital transportation. Inadequate staffing at the jails

21  puts the safety, security, and health of incarcerated people at serious risk.

22      39.  Because of custody shortages, Defendant routinely staffs only two

23  deputies to areas that house as many as 200 people of differing security factors

24  and needs. Without sufficient custody staffing to supervise it's population,

25  Defendant simply locks up hundreds of people inside their cells for 22 to 24 hours

26  every day.

27      40.  Dramatic shortages in medical and mental health care staffing also

28  put people in the jails at serious risk of harm. Chronic shortages in the number

of health care professionals contribute to inadequate intake procedures and follow-up, extreme delays or lapses in care, an overreliance on nurses acting beyond their scope of practice, and dangerous medication administration practices.

        B. Defendant has ignored Report after Report calling for significant increases in staffing in the jails.

41.    Defendant is aware of the dangerously low staffing levels because multiple Reports over the last decade – including Defendant's own internal Reports, Reports commissioned by Defendant, and investigations conducted by the Sacramento County Grand Jury – have repeatedly found that staffing is inadequate and poses a danger to inmates and staff.

42.    In 2009 the Office of the Inspector General ("OIG") conducted a Jail Operations Audit for the Sacramento County jails. The audit noted that "significant staffing deficiencies" at Defendant's jails had persisted for back as 2005, but none-the-less persisted. The OIG found that understaffing among health care professionals was jeopardizing the effectiveness of intake health care screening at the jails, with implications for public health.

43.    A year later, the OIG again reported that Defendant's jails were "understaffed by any measure." The staffing study concluded that "sufficient staffing to safely and effectively do the job is rarely, if ever, reached," and that the low staffing levels compromised safety.

44.    In 2011, the Sacramento County Grand Jury found that Defendant's insufficient deputy staffing prevented the provision of sufficient out-of-cell time to people in the jail and contributed to low staff morale.

45.    In January 2015, Health Management Associates ("HMA"), a consulting group hired by Defendant, found that "[m]ental health staffing compared to other jails and increasing service demands and wait times, may be placing the county at poor behavioral health outcomes." HMA found that

1  Defendant did not have sufficient nursing or physician staff to address
2  chronic care needs of patients, and lacked a regular process to collect and
3  evaluate access to nursing, address bottlenecks, or situations that causes
4  lags, and the subsequent risks.[44]

5      46.  In June 2016, the Sacramento Grand Jury issued a report descri-
6  bing RCCC as "overcrowded" and observing that custody staffing levels were
7  lower than similar-sized facilities. The following year, the Grand Jury again
8  found that staff shortages were of primary concern.

9      47.  In November 2016, yet again another consultant, CGL, reported
10  that Defendant operated the main jail with a staff-to-prisoner ratio that "far
11  exceeds advisable levels." The CGL report found that "main jail staffing does not
12  meet contemporary standards for adequate supervision of the inmate
13  population." CGL concluded that housing unit staffing alone would have to
14  almost double in order to meet recommended supervision levels.

15      48.  Mr. Jail, Defendant's expert consultant in correctional
16  practices, recently reported that Defendant's jail system was "dangerously
17  understaffed and struggling to even meet the minimal requirements of their own
18  current policies." He called for sizable increase in mental health and
19  custody staffing.

20      49.  Other experts retained by Defendant made similar findings.
21  Dr. Austin, Dr. Gage, and Sabot consulting reported that staff shortages
22  in Defendant's jails undermine the provision of minimal adequate health
23  care, prevent compliance with state and federal disability law, and
24  contribute to inhumane conditions of confinement.

25      50.  Despite these repeated warnings, Defendant has failed to
26  increase staffing levels in a meaningful way. Current staffing levels
27  are nowhere close to sufficient to address the risk of substantial harm to people who
28  are incarcerated in Defendant's jails.

II.   DEFENDANT IMPROPERLY SUBJECTS PEOPLE IN THE JAILS TO PROFOUND, PROLONGED, AND HARMFULL ISOLATION.

    A. Conditions of Confinement in Defendant's RESTRICTIVE Housing Units Are EXTREMELY HARSH and HARMFULL.

51.   Defendant, by it's policy and PRACTICE, locks hundreds of people each day in Tiny, dirty, concrete cells with no air ventilation for at least 23 ½ hours per day, with little to no opportunity for human interaction, exercise, shower, or recreation, in many cases for months or even years at a time.

52.   According to Defendant's policies and practices, individuals in the Jail are only entitled to three hours of out-of-cell time per seven-day period.   In practice, Defendant often fails to ensure that even that small amount of out-of-cell time is provided due to staffing shortages, lockdowns and insufficient space.

53.   Defendant created and maintains an extremely harsh form of solitary confinement called "Total Seperation," otherwise known as "T-Sep." Defendant deprives individuals classified as T-Sep of virtually all human contact. People on T-Sep live in single cells, by policy are permitted no more than 30-minutes outside of their cells per day, have essentially no access to sunlight or fresh air, and have limited access to showers, books, mail, phones, and canteen privileges. Defendant often offers out-of-cell time late in the middle of the night or very early in the morning, preventing individuals from getting to a phone at a time when they can reach their loved ones, attorney's, or make legal calls during normal business hours. Even when individuals in T-Sep units are permitted to be out of their cells they are forbidden from Recreation or socializing with others.

54.   Defendant holds hundreds of people in extreme conditions of T-Sep for months or years at a time.   On average, people have been held on T-Sep status for six months and, in some cases, many years.   Plaintiff ROJAS has spent nearly all his approximately 6-months at the Sacramento County main Jail in solitary confinement as a "T-Sep" Prisoner.

55.   Similarly, under it's policies and practices, Defendant denies almost all out-of-cell time to individuals subject to disciplinary detention units. People in disciplinary detention spend their days in total isolation, prohibited from social contact, and nearly all their property, phone calls, mail, or other forms of normal social contact. For example, Defendant has placed Plaintiff ROJAS in solitary confinement for long periods Repeatedly, despite knowing that he has significant mental health needs, a history of suicide attempts, and painful skin condition. During various prolong periods of 10-day long or more stretches often ran consecutive to another 10-day long or more stretch in Disciplinary Isolation Defendant did not allow Mr. Rojas any time outside of his cell even to shower or throw out his garbage. He was left to languish in his cell with a vastly growing pile of garbage that attracted flies, bugs, insects, and Rodents. The lack of air flow and stuffieness in his cell exacerbated his lung disease and caused him to suffer borderline heat stroke after in-cell temperatures went beyond 90 degrees while he was on heat medication. The denial of showers also greatly exacerbated his already painfull Rashes and itchieness.  He also experienced worsening depression, panic attacks, anxiety, insomnia, claustrophobia, mental trauma, and increase in suicidal ideation and suicide attempts while in isolation.

56.    Defendant's Restrictive housing unit is compiled of 4 Tiny Pods that hold 32 Restrictive housing unit cells that are tiny concrete blocks jammed close together. There are 4 tiny concrete showers (2 on the top teir and 2 on the bottom teir.). There is no shower curtains, wall handles for hanging up clothes and towels, wall Rails or fold out wall seats for individuals who are disabled. The shower nozzle's protrude towards the wall forcing individuals to bathe up against filthy walls contaminated with bacteria, fungi, mildew, and bodily fluids. Showers Regularly overflow with hair, trash, feces and urine. They are never properly cleared or sanitized. In November 2021 one individual developed athlete foot and staph infection from the shower. There is no fresh air or natural light, no clocks or calenders, and no method to track dates or time. There are 4 phones placed too high on the wall for individuals

1  To use that have no phone receivers making it almost impossible to hear or speak.
2  The phones do not hang up when a individual presses the hang up button, and the phone
3  voice recognition software is so inadequate a individual has to repeatedly wait
4  for the phone to hang up and try it 4 to 5 times, until it works, which can take up
5  to 15 to 20 minutes to accomplish a 1 call call. Lack of ventilation and inadequate
6  temperature control lead to sweltering temperatures in the summer and freezing
7  conditions, in the winter. Defendant does not provide adequate clothing for
8  the summer like shorts, or the winter like thermals, leaving individuals to freeze
9  or be in imminent danger for heat stroke. Defendant recalled and confiscated
10 all white under t-shirts from individuals, and banned any further
11 distribution of them since November 2021. Mr. Rojas has now been left
12 with only one orange outer-top, one pair of pants, one pair of underware,
13 one pair of socks, and one pair of green rubber sole slipper's. Defendant
14 only allows clothing exchange ever three to four days, wether
15 clothing is soiled, dirty or contaminated they will not be able to
16 exchange them any earlier than that. During the summers the air
17 ventillation is turned off well in the winter time defendant
18 turns the air on full blast. Defendant sometimes fails to provide
19 mattresses, leaving Mr. Rojas and other individuals to sleep on
20 hard, cold, dirty floors for days. Defendant fails to maintaine basic
21 cleanliness and sanitation, housing individuals in cells and rekated are
22 covered in feces, and urine, old food, garbage, bugs, insects and
23 rodents. Many lack outside windows or visibility from one cell to
24 another, and only small windows to the dayroom that have been
25 obstructed by large podeams potruding from the floor to the
26 ceiling, increasing the isolation and sensory deprivation. For example
27 Mr. Rojas was placed into two different cells, located directly
28 behind a large concrete podeum where he could not see beyond the

it. In Room cell Defendant optimized the increase in isolation and sensory deprivation by constructing a high security food port contraption device which is commonly utilized in New Folsom Max Security Prison's Solitary Confinement SHU. The use of such contraption triggered MR. Rojas claustrophobia symptoms precipitated traumatic experiences resulting in him attempting suicide. The Defendant was aware that this housing would trigger such response and still refused him to the cell. In either event Defendant left MR. Rojas to languish in these cells for months at a time, leaving him unable to see nothing but the podium and not be able to watch TV. Defendant only targets specific mentally ill individuals to house in cells with the metal food port contraption device, not all cells possess the device only MR. Rojas and a couple other cells do.

57. Defendant's failure to provide adequate mental health care exacerbates these serious health and sanitation problems. One expert found that Defendant lacks the resources to adequately treat people with serious mental illness housed in isolation, in some cases leaving them to languish in their own urine, feces, and garbage. Bodily fluids, and garbage leak out of individual cells into the hallways and out on the tier making conditions to everyone around them.

B. Conditions of Confinement in Defendant's mental health Crisis bed unit are extremely harsh and harmful.

58. Defendant by its policy and practice, locks hundreds of people each day in tiny, dirty, cold and cold hot stuffy cells with no air ventilation for at least 24 hours a day, with little to no opportunity for human interaction, exercise, or recreation in many cases for weeks or months at a time. Access to the

59.   According to Defendant's policies and practices individuals in the jail are entitled to "zero hours of out of cell time per seven day period. In practice, Defendant fails to ensure individuals recieve access to a phone, legal visits, Regular visits, shaving and cold showers, due to staffing shortages, lockdowns, and insufficient space.

60.   Defendant has created and maintains an extremely harsh form of Psychiatric Solitary Confinement. Defendant virtually deprives individuals housed in safety cells on suicide watch of virtually all human contact. People housed in safety cells live in single one-man cells, by policy are permitted no Dayroom or outside Recreation time, have no access to sunlight or fresh air, and have no access to showers, phones, books, and canteen, and legal (or) Regular visits, or other forms of normal human contact. For example MR. Rojas was placed on suicide watch and housed on the third floor of the jail where Defendant seperated half the pod with people classified as "IOP" and the bottom half as people on suicide watch. He has spent his entire time on suicide watch in total isolation, prohibited from all social contact, as Defendant prohibits any interaction with other individuals on or off suicide watch. Despite knowing that he has significant mental health needs, a history of multiple suicide attempts, and has currently attempted suicide well housed on suicide watch more than 4 times in less than one week. For over a week Defendant has denied MR. Rojas a shower, tablet, legal visits, out of cell Dayroom time, outside Recreation time, phone calls, and no access to tv. MR. Rojas safety cell faces a all white brick wall. Defendant has unplugged the tv and fails to answer MR. Rojas or anyone else's call light. The _____

113. Defendant grossly mistreats people who are identified as suicidal. Defendant's policies and practices are unnecessarily and inappropriately punitive, relying on excessive isolation and deprivation, which can be even harsher than the conditions experienced by people facing disciplinary sanctions.

114. When a person is identified as suicidal, Defendant strips him or her of clothes, removes the person from his or her cell, and places him or her in temporary housing without any personal belongings and no access to phones or visitation from family. Is deprived the right to appear at court for scheduled court dates, and has no access to legal phone calls, law library, or legal visitation with attorneys, private investigators or witnesses. If a person is unwilling or unable to take off his or her clothing, deputies forcibly removing it by ripping or cutting it off their body with scissors. Plaintiff ROJAS has had his clothing ripped and cut with scissors by Defendant over 3 times and has had to witness a female inmate have her clothes cut and ripped by Defendant in the presence of male deputies. Mr. Rojas was denied his legal material and property, legal phone calls, and legal visitation 5 times well housed in temporary housing. This prejudiced Plaintiff's civil and criminal matters. Defendant specifically told Mr. Rojas he would "not like" the temporary housing unit in SITHU because people housed there are ", not allowed legal phone calls, legal visits, or showers" and "Not allowed to go to court well on suicide precaution" because court deputy's do not have time, nor want to watch people like you that are on suicide watch. Defendant instructed Plaintiff to "Go back to your regular housing if you want dayroom and law library, or you want to make legal calls and go to court" because "that's not allowed on suicide watch", "Per policy". On information and belief, this practice has included male deputies forcibly removing women's clothing or being present during the process.

115. Defendant routinely places people who are actively suicidal in "barren safety cells" or empty classrooms, while they await

psychiatric attention. Classrooms, also known as multi-purpose rooms, are located in the center of housing pods, and enclosed in large windows, leaving the person exposed to the gazes of others during a mental health crisis. Defendant confines people who are suicidal in these harsh conditions around the clock for extended periods of time while they await psychiatric assessment. These places have no beds, mattresses, toilets, or sinks, and are not equipped to house anyone on an extended basis, let alone a person who is actively suicidal.   One woman in a classroom was prohibited from leaving the room to use the bathroom, and was told by custody staff to "Piss in the drain in the floor."

116.   Defendant has placed Plaintiff in a barren suicide precaution cells that are covered in feces, urine, blood and other dangerous bodily fluids and hundreds of flies and gnats. Defendant's custody staff have told Plaintiff to "Shit in the grate in the floor" or "piss in it." Plaintiff has asked custody staff how to do that without a toilet and custody staff have told him "squat and drop" and "turn around and say cheese" to the camera in the cell.

117.   Defendant's experts have condemned Defendant's reliance on classrooms for suicide watch. Dr. Cohn described the setting as "punitive" and stated that "[T]he use of the so-called 'classrooms' holding inmates pending evaluation or on [suicide watch] monitoring needs to be halted. These are not living spaces, have no toilet or basic fixtures, are publicly visible spaces, and are not suicide proof." Similarly, Mr. Hayes reported that "[T]he classrooms ... should not be utilized for the housing of suicidal inmates (for any duration)." Mr. Vail called

The setting "humiliating" and recommended that Defendant immediately cease using classrooms for suicide watch. Nonetheless Defendant continues to put people in dire psychiatric crisis in these degrading unsafe settings.

118. Plaintiff has been placed in these cells several times and has begged mental health staff to remove him from suicide precautions because sleeping on the hard, cold, filthy floor without clothing was so cold and made his chronic back pain worse.

119. Defendant has a practice of placing individuals on suicide watch in places with known suicide hazards. For example the classrooms that Defendant uses for suicide watch contain light fixtures, vents and other protrusions that can be used by individuals attempting to hang themselves. The segregation cells also have metal grates that can be used to hang themselves or toxic waste that can be consumed. Defendant's experts have found that even the designated "mental health units" in the jails have unsafe features for people at risk of suicide or self harm. Yet Defendant has failed to commit the resources to address these known hazards in its jail facilities.

120. Defendant's own experts have found that Defendant relies excessively and inappropriately on "safety suits" which are garments designed to prevent a person from using the fabric as a noose or otherwise to commit suicide. Safety suits are heavy, bulky, uncomfortable, and triggerizing. Defendant uses safety suits indiscriminately and for excessively long periods of time, in some cases several months. In addition, Defendant forces some people to wear safety suits

1  — with no other clothing, including no underwear, even after
2  they are no longer suicidal, a degrading and punitive practice.
3      121.    One man with a mobility disability who requires
4  use of a walker or cane has been placed on suicide watch in a barren
5  "safety cell" or classroom more than six times at Sacramento
6  county jail. During one such incident, he was placed in a safety
7  cell without an assistive device and no alternative accommodation
8  for his disability. Defendant left the individual lying on the floor
9  in a safety suit, where he urinated on himself and remained
10  in a urine-soaked suit for more than four hours.
11      122.    Defendant has cut off Plaintiff's clothing cutting
12  and slicing into his skin and ripping off Plaintiff's clothing
13  violent and aggressively causing plaintiff to suffer flash backs
14  anxiety and panic attacks at each time Plaintiff was not
15  suicidal but Defendant used unnecessary excessive force to
16  put him in a wrap device disregarding his physical disability
17  chronic back pain, and nerve damage. Custody staff slammed
18  Plaintiff's face into the ground, twisted his arm threatening to
19  break it and twisted his legs and ankles, hands and wrists
20  in mechanical restraints to inflict pain while they forced his
21  legs towards the back of his head while he lay face down on his
22  abdomen to cause asphyxia. Plaintiff screamed for help
23  telling custody staff he has back problems, nerve damage, and
24  COPD but Defendants disregarded him. Custody staff threatened
25  to stab him with a pocket knife they carried and caused
26  Plaintiff to lose consciousness.
27      123.    On more than a occasions, Plaintiff was left
28  naked in a wrap device to suffer pain. On more than

1  5 occasions Plaintiff was left naked in a suicide watch
2  Safety cell for more than 2 days. Plaintiff has witnessed
3  other individuals languish away in the same type of safety cell
4  for over a week or 3 weeks. Individuals are left to languish
5  in scabies or other peoples' feces and blood.
6      124.    Defendant has a practice of disclosing confidential
7  information without the authorization of Plaintiff. The
8  disclosed records are misused and manipulated in falsified
9  reports used in adverse criminal court proceedings to
10  assassinate Plaintiff's character and deny him mental health
11  diversion.
12      125.    Defendants practice of subjecting people who are
13  suicidal to punitive isolation and deprivation is extremely
14  harmful, exacerbating existing mental health crisis. Research
15  indicates that these type of punitive responses to suicidality
16  makes incarcerated people reluctant to discuss their suicidal
17  thoughts because of they harsh conditions they will face on
18  suicide precautions. Defendants policies and practices place
19  an already vulnerable population at further risk of decompens-
20  ation and death.
21      126.    Defendant's mental health staff punish the
22  Plaintiff by forcing him onto a Alternative Treatment Plan
23  whenever he feels suicidal. The "ATP" allows Defendants to
24  restrict Plaintiff from going to group therapy, attending
25  dayroom with other people and further isolates him by himself.
26      C.   Defendant's knowing failure to take
27          Adequate Suicide Prevention Measures
28          Has Tragic Consequences.

127.   Defendant's knowing failure to reform its suicide prevention practices consistent with the detailed report of its expert, Lindsay Hayes, has had tragic consequences. Since November 2016, there has been a terrible rash of suicides in Defendant's jails, with inmates dying by suicide at a rate nearly twice the national jail population average. At least three suicide deaths have occurred in solitary confinement housing units.

128.   In 2017, two men died by suicide in Defendant's jails. One man hanged himself hours after he was booked into the jail. He indicated at the time of intake that he previously had been hospitalized for mental health treatment. At the time of his death he had pending referral for psychiatric services.

129.   Another man hanged himself in his cell after spending almost four months as a total separation" inmate. He had previously sought mental health treatment at the jail, stating he was nearing a mental breakdown and needed help coping with suicidal thoughts.

130.   So far in 2018, there have been two suicides in Defendant's jails. One man hanged himself in his T-Sep cell. At the time of his arrest, the individual had been taken by police for psychiatric evaluation because of his erratic behavior. Despite indications that the man had serious mental health needs, he was housed nearly two months in solitary confinement in total "separation" status. He remained a T-Sep prisoner until the time of his death by suicide.

131.   Another man hanged himself inside his cell the day after his attorney had requested a mental health

1  evaluation on his behalf. The evaluation never took place.

2  The man had been openly sobbing in his housing unit the

3  day that he died.

4      131.   The county main jail continues to be plagued with death.

5  In 2022 a female inmate died by suicide while housed in the

6  mental health housing unit. Many more mentally ill individuals

7  have attempted suicide by slicing their wrists open, bursting

8  open their head, or attempting to hang themselves, including Plaintiff.

9      132.   In a recent period of less than 18 weeks,

10  Defendants recorded more than 600 placements of individuals on

11  suicide precautions. On information and belief, nearly 200 of

12  these placements were in the makeshift "classrooms" that were

13  never designed to house people with acute mental health needs.

14  Dozens more were placed in barren safety cells.

15      133.   Despite knowledge of the serious shortcomings

16  in its suicide prevention practices and ongoing physical hazards

17  in the jails, Defendant has failed to take reasonable steps to

18  address the harm to Plaintiffs.

19          A.   Defendant fails to provide minimimally adequate

20              Mental health treatment.

21      134.   For the vast majority of individuals identified

22  as having mental health needs, Defendant provides no more than

23  the most rudimentary mental health care: basic assessment, psychotropic

24  medication management, and crisis response. Defendant does not

25  provide adequate treatment planning, and it does not provide adequate

26  and sufficient evaluations and testing, or offer adequate individual

27  or group therapy, structured activities, or rehabilitative programs,

28  educational or religious services. Defendant's experts have found

1  that when mental health care staff respond to requests for
2  care, such visits can be as short as 15 to 30 seconds.
3     135.  Defendant fails to provide confidentiality for
4  mental health contacts. Instead, clinicians routinely
5  meet with patients cell front or in other heavily trafficked
6  areas, or within the classroom which has a camera and
7  speaker in the wall for eavesdropping. This practice severely
8  limits patients privacy and interferes with the provision
9  of mental health services. Many people refuse treatment in public
10 or are unwilling to share important information when other
11 staff or prisoners can hear them.
12    136.  The experience of Plaintiff ROJAS who has a
13 history of suicide attempts and significant mental health
14 needs, illustrates this systemic problem. Defendant's mental
15 health staff have communicated with Plaintiff almost
16 exclusively at cell front, at small desks outside the pod across from
17 the custody desk, or in an open door classroom with a camera
18 and speaker. Plaintiff does not feel safe discussing his mental
19 health within earshot of custody and others in the area. The
20 lack of privacy has undermined any clinical treatment provided
21 by mental health staff, leading to Plaintiff experiencing decompensation
22 and suicidal thoughts.
23    137.  Even in the Main Jails acute Psychiatric unit, Defendant
24 fails to provide necessary mental health care. Mental health staff
25 provide little to no individualized treatment beyond medication management.
26 Plaintiff was told by Mental health staff that they do not provide trauma
27 therapy and that it would be unethical to do so. The conditions in the acute
28 care unit are grim. Defendant confines patients to their cells, which are

1  small, dirty concrete boxes that often smell like urine and feces, for
2  up to 23 hours per day.  Out of cell time for acute patients is
3  limited to no more than one hour per day, in a bare dayroom with no
4  space to exercise and no opportunity to engage in therapeutic
5  activity.  The unit is extremely noisy with people shrieking and
6  banging on their cell doors because of poorly treated mental
7  illness.

8      139.   The acute inpatient unit also lacks sufficient capacity
9  to meet demand for inpatient care.  Many people requiring
10  inpatient care are left waiting for extended periods of time
11  because the unit is understaffed, has an insufficient number of
12  beds, and frequently has a waitlist for admission.  Individuals
13  with acute treatment needs are routinely left to languish in isolation
14  cells and rooms designed to be used for jail programming because
15  Defendant has no treatment bed available to them.  Plaintiff
16  has been referred several times for placement in the inpatient
17  mental health unit due to suicidal ideation and other acute
18  symptoms of mental illness.  Each time he was placed on the inpatient
19  waitlist due to lack of bed space, resulting in a delay and outright
20  denial of clinically indicated inpatient care.

21      140.   Defendant's Intensive Outpatient Program ("IOP"),
22  created to provide sheltered living to male inmates with subacute
23  mental health needs, has markedly inadequate capacity to meet the
24  treatment needs of the jail population, and relies on extreme
25  disciplinary sanctions whether or not mental illness contributed or
26  influenced the behavior leading up to the rule violation report ("RVR")
27  with the primary focus on extreme isolation.  Defendant has not
28  only placed Plaintiff on full disciplinary sanctions to include "Phone Restriction"

1 | Tablet Restriction, TV Restriction, and Restriction to only out-
2 | of-cell Dayroom after 11:00 pm to 2:00 am, while everyone else
3 | is asleep, and Restricted access to the top tail to interact and socialize
4 | with other individuals, but also uses a disciplinary type
5 | mental health plan called "Alternative Treatment Plan" or ("ATP"),
6 | which Restricts Plaintiff from access to group therapy or
7 | any kind of interaction with individuals, including coming out with
8 | other individuals to pick up meals.
9 | 141.   Plaintiff has not been able to contact his mother,
10 | who has cancer and is going through on going life-threatening
11 | surgeries like spinal and neck surgery for over 6 months, or his
12 | wife in almost a whole year. Defendant has restricted
13 | Plaintiff from contacting lawyers or outside community businesses
14 | who advocate and help inmates. Plaintiff's mail, legal mail and
15 | emails are withheld, delayed, tampered, destroyed, and (or)
16 | disposed of.   Plaintiff has had no interaction with the outside
17 | community, has not been able to watch TV in over 6 months,
18 | or read a newspaper. Plaintiff is living in the dark ages in the
19 | jail with little to no hope.   As a Result, Plaintiff and others
20 | people cycle in and out of acute-care settings and suicide watch,
21 | or simply end up warehoused in solitary confinement with
22 | worse acute symptoms.
23 | 142.   Defendant punishes people with mental illness
24 | for behaviors associated with their mental health or other
25 | disabilities. Defendant does not have or use any adequate or
26 | sufficient mechanism for identifying individuals with disabilities,
27 | during the disciplinary process, or providing accommodations to
28 | ensure they understand the charges against them and can participate

1   in the process.

2       147.   Defendant even imposes disciplinary sanctions

3   for individuals on suicide watch. In one case, an individual

4   on suicide watch allegedly removed a piece of cistern and used it

5   to cut his wrists. Defendant handcuffed the individual

6   put him in a barren cell, and charged him with vandalism, theft

7   and insubordination for turning back to an officer. Defendant

8   failed to provide the individual with adequate treatment for

9   his self-harming behavior and did not consider how mental illness

10  contributed to his behavior before imposing sanctions.

11      148.   Plaintiff has developed worsening OCD precipitated post

12  traumatic events and other ill effects from years in isolation and

13  sexual misconduct and sexual harassment by staff in the Sacramento

14  County jails. Has been disciplined more than 10 times for insubordination

15  for covering his cell window partially with a privacy screen while

16  he uses the restroom, works out, or bathes. The camera points directly in

17  Plaintiffs cell and Defendants walk ever 15-20 minutes to do rounds

18  at which time one of them has sexually harassed him repeatedly

19  asking Plaintiff whether or not his bisexual, asking to deep throat all 12

20  inches of his "cock" and to "massage" his "balls" while Defendant

21  does it.

22      149.   Each time Plaintiff turned down Defendants sexual

23  advances and protected himself with a privacy screen Defendant

24  gave him a RVR imposing further "lockdowns" and disciplinary

25  sanctions as punishment, thus denying Plaintiff the already miniscule

26  out-of-cell time permitted to individuals in total segregation units.

27  These practices are extremely harmful and discriminate against

28  people based on their disabilities.

1   150.   In other events, Plaintiff who has developed

2   irregular sleep patterns and other ill effects from his years

3   in isolation in Sacramento County jail has been disciplined more

4   than ten times for "failure to rise" when juveniles count prisoners

5   in the unit during the few hours he is able to sleep. Each time

6   Defendant imposed further "lockdowns" as punishment, thus denying

7   Plaintiff the already miniscule out-of-cell time permitted to individuals

8   in total separation units. These practices are extremely harmful and

9   discriminate against people based on disability.

10      B. Defendant fails to provide Basic Pre-Release Discharge

11   Planning To Individuals with Serious Mental Illness.

12      151.   Defendant fails to adequately prepare people with mental

13   illness for transition back to the community after their

14   incarceration. Barely three percent of the 4,000 people released

15   each month receive services. Due to insufficient

16   staffing and resources, Defendant fails to supply medication to people

17   receiving psychiatric medications in the jail when they are released

18   to the community, leaving people with dangerous gaps in treatment.

19   Some do not know what their diagnosis is, what medications they take,

20   or how to renew their prescriptions.

21      152.   Defendant's failure to provide sufficient discharge planning

22   services means that individuals cycle in and out of the jail again

23   and again, in some cases returning to the jail within 24 hours of release.

24      153.   Defendant also routinely discharges individuals

25   directly from solitary confinement to the streets, with no preparation

26   for the transition and little to no regard to the lingering psychological

27   effects of isolation.

28      C. Defendant is Deliberately Indifferent to the Harm Caused By

1  Its Deficient Mental Health Care Practices.

2      154.   Defendants policy and practices cause severe harm to

3  people with serious mental illness. Defendants practice of

4  subjecting people with mental illness to severe isolation, deprivation

5  and lack of treatment exacerbates existing mental illness, leading

6  to increased anxiety, depression, psychosis and other serious mental

7  health symptoms.

8      155.  Defendant is well aware of the inadequacy of its mental

9  health care system. The November 2016 Report by CGL found that

10  "[T]reatment programs and housing for mentally ill offenders... do not

11  meet contemporary professional standards". CGL documented that many

12  people with mental illness in the jails are "confined to their cells for most

13  of the day." This, in turn, "affects the safety of staff, who face more

14  challenging and volatile inmates in a physical plant that was not designed

15  for that population, and the mentally ill offenders themselves, who may

16  became a danger to themselves and those around them because of inadequate

17  facilities and treatment."

18      156.   Defendants expert DR. Grage made similar findings of a

19  failing mental health system, documenting numerous critical

20  failures in the provision of care to individuals with severe psychiatric

21  disabilities.

22      157.   MR. Vail and Stroot Consulting reported on deficient

23  mental health services and the unjustifiable reliance on solitary

24  confinement to deal with the individuals with mental health needs in

25  Defendants jails.

26

27

28